**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket Nos. 37314/37315**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | )    **2011 Opinion No. 20** |
|      Plaintiff-Respondent, | ) |
| | )    **Filed: April 12, 2011** |
| v. | ) |
| | )    **Stephen W. Kenyon, Clerk** |
| JAMES FREDRICK PEPCORN, SR., | ) |
| | ) |
|      Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Minidoka County. Hon. R. Barry Wood, District Judge.

Judgment of conviction in Docket No. 37314 for lewd conduct and rape, vacated, and case remanded. Judgment of conviction in Docket No. 37315 for sexual abuse of a child and lewd conduct, affirmed.

The Roark Law Firm, Hailey, for appellant. R. Keith Roark argued.

Hon. Lawrence G. Wasden, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for respondent. John C. McKinney argued.

_____

LANSING, Judge

In these consolidated cases, James Fredrick Pepcorn, Sr., appeals from his judgments of conviction for rape, lewd conduct with a minor, and sexual abuse of a child. Pepcorn argues that the district court erred during his trial by permitting evidence of other alleged incidents of Pepcorn's sexual misconduct with minors. We conclude that error occurred, that the error was harmless in one case, but that the error necessitates a new trial in the other case.

**I.**

**BACKGROUND**

In Docket No. 37314, Pepcorn was charged with one count of lewd conduct and one count of rape for his actions against A.R.G., his niece by marriage. He was charged in Docket No. 37315 with two counts of sexual abuse of a child and one count of lewd conduct for his acts against A.J., another niece by marriage. The cases were consolidated for trial.

1

A.R.G. testified that when she was six or seven years old, in 1992 or 1993, while her family was visiting Pepcorn at his farm, he sexually molested her. She said Pepcorn took her for a ride on a four-wheeler into a field where he digitally penetrated her. She also testified that on a subsequent visit to the farm, still when A.R.G. was six or seven, Pepcorn anally raped her in his bedroom.

A.J. testified to sexual touching while she was visiting the Pepcorn farm with her family before she was twelve or thirteen. She turned twelve in 1995. According to A.J., Pepcorn touched her bottom and the sides of her breasts when he gave her hugs. She said Pepcorn also lifted her onto his horses by placing his hands on her crotch and bottom and massaging her there while he lifted her up. A.J. said that during one visit, Pepcorn ran his hand up A.J.'s thigh and close to her vagina after he asked her to sit in his lap while he was watching television.

Prior to Pepcorn's trial, the State filed in each case a notice of intent to introduce evidence under Idaho Rule of Evidence 404(b) to show that Pepcorn had engaged in sexual misconduct with six other persons related to him by marriage when they were minors. These persons will be referred to as D.G., P.J., P.G., C.G., T.G., and R.H. After hearing five of the six witnesses' testimony at a hearing *in limine*, the district court preliminarily ruled that the proffered testimony would be permitted. The court deemed the testimony relevant to show "a common plan or scheme to sexually abuse an identifiable group of young persons, many of whom are approximately the same age, with whom the defendant is related, and with whom the defendant has access to by reason of his familial and blood relationship." The court also found their testimony relevant to show absence of mistake or accident, opportunity, and preparation.[1] Then the court determined that the probative value of this evidence was great, but noted that the volume of this other misconduct evidence increased the possibility of unfairly prejudicial impact. Ultimately, the court determined that the probative value outweighed the danger of unfair prejudice as to at least some of the evidence, but left undecided whether the admission of all the proposed I.R.E. 404(b) testimony would result in its probative value being substantially outweighed by the danger of unfair prejudice. The trial court did not subsequently address this

---

[1] The court also found the evidence relevant to credibility. However it later renounced that position in the context of ruling whether or not the jury should be instructed that the evidence could be considered for credibility purposes. The court determined that the evidence could not be used for credibility and so declined to instruct the jury that it could consider the evidence for that purpose.

issue, nor did Pepcorn subsequently raise it despite being invited by the trial court to submit supplemental briefing on its I.R.E. 404(b) ruling. The State filed two more notices of intent to introduce I.R.E. 404(b) evidence prior to trial, adding three witnesses, also related to Pepcorn by marriage, who would testify to sexual misconduct by Pepcorn when they were minors: A.G., A.T., and T.S. Only A.G. and A.T. ultimately testified at trial. Pepcorn's objections to A.T.'s and A.G.'s testimony were sustained initially, but both witnesses were ultimately allowed to testify because the court concluded that Pepcorn opened the door through cross-examination questions and statements he made while testifying in his own defense. Pepcorn does not challenge the admission of A.G. or A.T.'s testimony on appeal. Thus, the other misconduct evidence on which Pepcorn now posits error came from D.G., P.J., C.G., P.G., T.G., and R.H.

Five of these witnesses, two females and three males, testified to events that happened many years prior to the charged conduct: Females D.G. and P.J., both testified that Pepcorn had once, and on separate occasions, digitally penetrated them while riding in his truck. This happened to D.G. sometime between 1963 and 1965, when she was six to eight years old. P.J. was two to five when it happened to her, sometime between 1962 and 1965.

Three brothers, C.G., P.G., and T.G., also testified to occurrences in the 1960s and 1970s. C.G. said that Pepcorn masturbated C.G. and forced C.G. to masturbate Pepcorn about once a week during a period from 1965 to 1967 when C.G. was eleven and twelve. P.G. testified to multiple instances of Pepcorn masturbating him and Pepcorn forcing P.G. to masturbate Pepcorn when P.G. was five to nine years old. During this timeframe, Pepcorn also forced P.G. to masturbate his brothers while Pepcorn watched. These events occurred from 1965 to 1969. Then, when P.G. was fourteen, in 1974, Pepcorn tried to put his hand in P.G.'s sleeping bag while they were camping, but no touching occurred because P.G. moved away and thereafter no further incidents of inappropriate touching occurred. T.G. testified to multiple instances of Pepcorn masturbating him between 1966 and 1975 when T.G. was from age four to thirteen. During this timeframe, Pepcorn also once forced T.G. to masturbate his brothers while Pepcorn watched and once forced T.G. to masturbate Pepcorn. In 1984, when T.G. was twenty-two, Pepcorn put his hand into T.G.'s sleeping bag while they were camping and touched T.G.'s penis, but T.G. rolled over, putting a stop to the contact.

Three other witnesses testified to events that were closer in time to the charged conduct. A.G. testified that when she was between the ages of twelve and sixteen, from 1988-1992,

Pepcorn touched her breasts while giving her hugs. R.H. testified that from the time she was seven until she was twelve or thirteen, from 1988 until 1993 or 1994, Pepcorn touched her breasts when giving her hugs and put his hand on her vagina and massaged her there over her clothes while he gave her rides on his four-wheeler. She also testified that Pepcorn once helped her onto his horse by placing his hands on her vagina and massaging her there while he lifted her up. This incident occurred when she was ten or eleven, in 1991 or 1992. A.T., the brother of R.H. and victim A.J., testified that he witnessed Pepcorn helping R.H. and A.J. onto a horse by holding onto them in the crotch area and massaging them there while lifting them up.

Pepcorn was found guilty on all counts. In A.R.G.'s case, the district court sentenced Pepcorn to concurrent terms of indeterminate life with twenty years fixed for the lewd conduct and rape charges. In A.J.'s case, Pepcorn was sentenced to concurrent unified terms of fifteen years with five years determinate for two counts of sexual abuse of a child under sixteen, and indeterminate life with twenty years fixed for lewd conduct with a minor under sixteen.

On appeal, Pepcorn asserts that the testimony of D.G., P.J., C.G., P.G., T.G., and R.H. should have been excluded under terms of I.R.E. 404(b).[2] The State contends that all of the challenged evidence was relevant to show that Pepcorn had a "common scheme or plan to sexually abuse young children related to him by marriage, to show absence of mistake or accident, and to show 'Pepcorn's motive, opportunity and preparation to sexually abuse the two named victims."

## II.

## ANALYSIS

### A. Legal Standards for Admission of Evidence Over a Rule 404(b) Objection

Evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's bad character or criminal propensity, but may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or

---

[2] Pepcorn also makes vague assertions in his reply brief concerning whether the consolidation of A.R.G.'s case with A.J.'s case was prejudicial. As this issue was not raised in the opening brief and is not supported by legal authority, we will not consider it. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996) (holding that a party waives an issue on appeal if argument or authority is lacking); *State v. Gamble*, 146 Idaho 331, 336, 193 P.3d 878, 883 (Ct. App. 2008) (holding that the court will not ordinarily consider issues raised for the first time in the reply brief).

absence of mistake or accident. I.R.E. 404(b). When determining the admissibility of evidence to which a Rule 404(b) objection has been made, the trial court must consider three factors: (1) whether there is sufficient evidence to establish the prior acts as fact;[3] (2) whether the prior acts are relevant to a material disputed issue concerning the crime charged, other than propensity; and (3) whether the probative value is substantially outweighed by the danger of unfair prejudice. *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009); *State v. Parmer*, 147 Idaho 210, 214, 207 P.3d 186, 190 (Ct. App. 2009). On appeal, this Court treats the trial court's determination that there is sufficient evidence of the prior misconduct as we treat all factual findings by a trial court--we defer to the trial court's finding if it is supported by substantial and competent evidence in the record. *Parmer*, 147 Idaho at 214, 207 P.3d at 190. We exercise free review, however, of the trial court's relevancy determination. *State v. Sheldon*, 145 Idaho 225, 229, 178 P.3d 28, 32 (2008); *State v. Scovell*, 136 Idaho 587, 590, 38 P.3d 625, 628 (Ct. App. 2001). The trial court's balancing of the probative value of the evidence against the danger of unfair prejudice will not be disturbed unless we find an abuse of discretion. *Grist*, 147 Idaho at 52, 205 P.3d at 1188; *Scovell*, 136 Idaho at 590, 38 P.3d at 628. Courts must carefully scrutinize prior acts evidence to "avoid the erroneous introduction of evidence that is merely probative of the defendant's propensity to engage in criminal behavior." *Grist*, 147 Idaho at 53, 205 P.3d at 1189.

Evidence of uncharged misconduct may be relevant as evidence of a common plan or scheme if it shows that the charged and uncharged acts were linked together as stages in the execution of an underlying plan as, for example, where evidence of an uncharged car theft is offered to show the accused's plan to use the car as a getaway for burglary. *See State v. Bussard*, 114 Idaho 781, 785, 760 P.2d 1197, 1201 (Ct. App. 1988). But evidence of a defendant's other crimes similar to the charged offense, if they are not shown to be progressive stages of a single plan, are not necessarily relevant under the "common scheme or plan" rubric. For example, a series of thefts that are connected only in the sense that they shared the common goal of getting money does not show a unifying "plan" within the meaning of Rule 404(b). *Id.* at 785-86, 760 P.2d at 1201-02.

---

[3] This finding is necessary because such evidence is relevant only if the jury can reasonably conclude the act occurred and the defendant was the actor.

In *Grist*, our Supreme Court explained that a defendant's other misconduct may also be relevant to prove a common scheme or plan if it embraces "two or more crimes *so related to each other* that proof of one tends to establish the other, knowledge, identity, or absence of mistake or accident." *Grist*, 147 Idaho at 54-55, 205 P.3d at 1190-91 (emphasis in original). Thus, in child molestation cases, "there must be evidence of a common scheme or plan beyond the bare facts that sexual misconduct has occurred with children in the past." *State v. Johnson*, 148 Idaho 664, 668, 227 P.3d 918, 922 (2010). The *Johnson* case provides an example of insufficient similarity to render prior acts relevant to demonstrate a common scheme or plan. There, the victims in both the charged offense and the uncharged act were about seven to eight years old, viewed the defendant as a familial authority figure, and were asked to engage in the same type of sexual contact. *Id.* The Court held that these similarities were "sadly far too unremarkable to demonstrate a 'common scheme or plan' in Johnson's behavior." The Court noted that "[t]he fact that the two victims in this case are juvenile females and that [defendant] is a family member are precisely what make these incidents unfortunately quite ordinary." *Id.* Prior acts that bear only general similarities to the charged offense are more aptly described as inadmissible evidence merely demonstrating a defendant's predisposition to commit the type of crime charged. *Id.* at 669 n.5, 227 P.3d at 923 n.5. The Supreme Court in *Grist* cautioned that "the trial courts of this state . . . must carefully examine evidence offered for the purpose of demonstrating the existence of a common scheme or plan in order to determine whether the requisite relationship exists." *Grist*, 147 Idaho at 55, 205 P.3d at 1191.

Evidence offered for the purpose of corroboration of the complaining witness "must actually serve that purpose." *Id.* at 53, 205 P.3d at 1189. As the Supreme Court stated in *Grist*,

> The trial courts of this state must carefully scrutinize evidence offered under I.R.E. 404(b) for purposes of "corroboration" as demonstrating a "common scheme or plan" in order to determine whether such evidence actually serves the articulated purpose or whether such evidence is merely propensity evidence served up under a different name.

*Id.* at 55, 205 P.3d at 91.

Although a lapse of time between the charged conduct and the prior acts generally goes to the weight of the evidence as opposed to its admissibility, "[a]s the subsequent act becomes more remote from the initial act, the remoteness makes the similarities more attenuated." *State v.*

*Martin*, 118 Idaho 334, 341, 796 P.2d 1007, 1014 (1990); *State v. Kremer*, 144 Idaho 286, 291, 160 P.3d 443, 448 (Ct. App. 2007).

**B.      Application of Legal Standards to These Consolidated Cases**

**1.      Testimony of R.H.**

The State's evidence vis-à-vis A.J. was that Pepcorn had committed sexual abuse by brushing the sides of A.J.'s breasts and touching her bottom when he hugged her and that he committed lewd and lascivious conduct by placing his hand on her vaginal area and bottom and massaging there while he lifted her up onto a horse. Pepcorn testified that if he touched A.J. inappropriately it was entirely accidental, not for sexual gratification. Thus, whether the touching asserted by A.J. was intentional or inadvertent was squarely at issue. R.H.'s testimony that Pepcorn engaged in precisely the same conduct with her in precisely the same setting when she was about the same age as A.J., and during approximately the same time frame, was plainly relevant to show the absence of mistake or accident. Given the highly probative value of R.H.'s testimony, the district court did not abuse its discretion in determining that the risk of unfair prejudice did not substantially outweigh the probative value.

The testimony of R.H. was not, however, probative for any permissible purpose to prove the State's allegations regarding A.R.G. The State alleged that Pepcorn took A.R.G. to an isolated location by giving her a ride into a field on his four-wheeler, where he ordered her to get off the four-wheeler, pull down her pants, and crouch in front of him, and then digitally penetrated her. The State also alleged that he anally raped A.R.G. in his bedroom, again when she was six or seven. The instances to which R.H. testified bear no resemblance to A.R.G.'s allegations and involve entirely different conduct by Pepcorn with victims several years older than A.R.G.'s age when she was molested. There is no basis to infer that Pepcorn's acts of brushing the breasts and bottom of R.H. from 1988 until 1993 or 1994 were done in preparation or to advance a plan to penetrate and rape A.R.G. The acts to which R.H. testified do not bear sufficient similarity to A.R.G.'s allegations to be corroborative of her testimony. In A.R.G.'s case, motive, intent, or absence of mistake or accident could not have been material disputed issues, for if the jury believed A.R.G.'s testimony, there could be no plausible question that the acts were intentional and motivated by a desire to gratify Pepcorn's sexual desires. Nor was Pepcorn's identity as the alleged perpetrator or his opportunity to commit the offenses as alleged

by A.R.G. disputed issues in the case. Accordingly, we discern no probative value of R.H.'s testimony to support the State's allegations in A.R.G.'s case.

## 2. Testimony of remaining witnesses

As to the remaining witnesses whose testimony is challenged here, this Court concludes that the evidence was inadmissible under I.R.E. 404(b) in both A.J.'s and A.R.G.'s cases. Pepcorn's acts that were related by the male victims, C.G., P.G., and T.G., were thoroughly dissimilar to A.J.'s and A.R.G.'s allegations. The three brothers testified that they were all forced to masturbate Pepcorn or each other and allow Pepcorn to masturbate them, during various camping trips and outdoor activities with Pepcorn. The victims were of a different gender than A.J. and A.R.G., the alleged acts were different, and the incidents were alleged to have occurred twenty to thirty years before the charged crimes. The only similarities are that the victims were all juveniles, were sexually abused, and were related to Pepcorn by marriage. These generalized similarities fall far short of the *Grist* and *Johnson* standard, for the charged and uncharged acts are not "so related to each other that proof of one tends to establish the other, knowledge, identity, or absence of mistake or accident." *Grist*, 147 Idaho at 54-55, 205 P.3d 1190-91; *Johnson*, 148 Idaho at 668, 227 P.3d at 922.

The events to which D.G. and P.J. testified are likewise so dissimilar to the charged offenses that they have no probative value other than to demonstrate propensity. These two girls testified to incidents of molestation that were remarkably similar to each other, but not to the experiences of A.J. and A.R.G. D.G. and P.J. each testified that Pepcorn had taken her for a ride in his truck, asked her to scoot over so she would not fall out if the passenger door accidentally flew open, pulled her toward him when she did not scoot close enough, and digitally penetrated the girl while continuing to drive the truck. The only factors that these events have in common with the charged offenses are that all of the victims were juvenile females related to Pepcorn by marriage and that they involved digital penetration, which was also alleged by A.R.G. The circumstances where this occurred were, however, very different from A.R.G.'s report. There was also a time lapse of about thirty years between the events to which D.G. and P.J. testified and the charged offenses.[4]

---

[4]     Although we hold that all of the challenged testimony should have been excluded in A.R.G.'s case, and all except the testimony of R.H. should have been excluded in A.J.'s case, it is understandable that the district court allowed the testimony inasmuch as the *Grist* and *Johnson*

We therefore hold that the testimony of C.G., P.G., T.G., D.G., and P.J. was erroneously admitted.

## C.    Harmless Error Analysis

This finding of error requires that we next determine whether a new trial is necessary in each case. The Idaho Supreme Court recently reexamined the standard for determining whether error in a criminal trial was harmless in *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010). The Court there adopted the standard that was stated by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18 (1967), for harmless error review of a constitutional error. The *Chapman* standard requires reversal unless the reviewing court is confident "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24. The *Perry* Court held that this standard would henceforth be applied to all objected-to error, whether of constitutional proportion or not. *Perry*, 150 Idaho at 221, 245 P.3d at 973. The *Perry* decision recognized that Idaho appellate courts have previously sometimes employed "pre-*Chapman* phraseology" when stating the applicable standard, as in *State v. Zichko*, 129 Idaho 259, 265, 923 P.2d 966, 972 (1996), where the query was phrased as whether "the evidence of the defendant's guilt is proven and is such as ordinarily produces moral certainty or conviction in an unprejudiced mind, and the result would not have been different had an error in the trial not been committed." *See Perry*, 150 Idaho at 221-22, 245 P.3d at 973-74. We note that this alternative standard has also sometimes been phrased as whether the reviewing court is convinced "beyond a reasonable doubt, that the result of trial would have been the same absent the error." *State v. Johnson*, 149 Idaho 259, 265, 233 P.3d 190, 196 (Ct. App. 2010). *Accord State v. Severson*, 147 Idaho 694, 716, 215 P.3d 414, 436 (2009); *State v. Hodges*, 105 Idaho 588, 592, 671 P.2d 1051, 1055 (1983); *State v. Pecor*, 132 Idaho 359, 368, 972 P.2d 737, 746 (Ct. App. 1998).

If applied literally, the *Chapman* test and the alternative "same result" expression of the test call for somewhat different queries to determine whether a trial error was harmless. That is, *Chapman* focuses on the effect that the erroneously admitted evidence could have had on the jury, while the "same result" test focuses on the effect of the untainted evidence, i.e., whether it

---

decisions had not yet been issued at the time of Pepcorn's trial. The district court relied upon authority that was partially overruled by *Grist*. *See Grist*, 147 Idaho at 54, 205 P.3d at 1190.

would have led the jury to the same verdict if the improper evidence had never been admitted. In *Perry*, our Supreme Court concluded, however, that the alternative phraseology "is so similar analytically to the standard employed under *Chapman*, that there is no practical difference." *Perry*, 150 Idaho at 222, 245 P.3d at 974.

While purporting to apply only the *Chapman* test, the United States Supreme Court has also vacillated between an approach that considers only the likely effect on the jury of the erroneously admitted evidence and an approach which focuses, instead, on the likelihood that the untainted evidence would have led to the same result. In *Satterwhite v. Texas*, 486 U.S. 249 (1988), the Supreme Court stated that the *Chapman* test is not "whether the legally admitted evidence was sufficient to support" a conviction but "whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict.'" *Id.* at 258 (quoting *Chapman*, 386 U.S. at 24). But in *Harrington v. California*, 395 U.S. 250, 253-54 (1969), while expressly confirming that the *Chapman* test is appropriate, the Court held that an error was harmless because the untainted evidence of guilt was "overwhelming." Justice Brennan, dissenting, asserted that the majority opinion thereby "shift[ed] the inquiry from whether the constitutional error contributed to the conviction to whether the untainted evidence provided 'overwhelming' support for the conviction" and that this approach "was expressly rejected in *Chapman*." *Id.* at 255. Justice Brennan stated that the majority's inquiry "concerns the extent of accumulation of untainted evidence" while his inquiry concerns "the impact of tainted evidence on the jury's decision." *Id.* at 256.

In *Sullivan v. Louisiana*, 508 U.S. 275 (1993), it appears that the Court sought to harmonize the two tests and treat them as the same inquiry. The Court there asserted that it was applying the *Chapman* test "because to hypothesize a guilty verdict that was never in fact rendered--no matter how inescapable the findings to support that verdict might be--would violate the jury-trial guarantee," but the Court then went on to note that the correct inquiry is "whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error." *Sullivan*, 508 U.S. at 279-80. The Court reconciled the two tests by explaining that the question is not whether, "a jury *would surely have found* petitioner guilty beyond a reasonable doubt" but whether "the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error." *Id.* at 280. Then in *Neder v. United States*, 527 U.S. 1, 18 (1999), the Court, still purporting to apply the *Chapman*

10

test, stated the relevant inquiry as: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" The Court concluded in that case that the evidence on an element of the offense that had been omitted from the jury instructions was uncontested and supported by overwhelming evidence such that "the jury verdict would have been the same absent the error." Therefore, the Court said, it was "beyond cavil here that the error 'did not contribute to the verdict obtained.'" *Id*. at 17. *See also Washington v. Recuenco*, 548 U.S. 212, 213 (2006) (following the *Neder* approach); 7 WAYNE R. LaFAVE ET AL., CRIMINAL PROCEDURE § 27.6(e) (3d ed. 2007) (observing that the most recent United States Supreme Court opinions follow the approach of "asking what the outcome would have been had the trial error not occurred" rather than applying the *Chapman* test "assessing the effect of the error on the trial that took place"); Brent M. Craig, *"What Were They Thinking?"--A Proposed Approach to Harmless Error Analysis*, 8 FLA. COASTAL L. REV. 1, 9 (2006) (asserting that the United States Supreme Court has "jump[ed] around; at times using the pure Chapman [sic] test of whether the constitutional error contributed to the verdict, and at other times appl[ying] the Harrington [sic] test of whether, notwithstanding the error, there was overwhelming evidence to convict the defendant beyond a reasonable doubt").

As Justice Brennan's dissent in *Harrington* illustrates, strict and literal application of the two expressions of the test can lead to different conclusions as to whether the trial error was harmless.[5] Nevertheless, in light of the United States Supreme Court's continued use of the

---

[5] An illustrative circumstance where different conclusions may be dictated by the different emphases of the two tests is posited in Linda E. Carter, *The Sporting Approach to Harmless Error in Criminal Cases: The Supreme Court's "No Harm, No Foul" Debacle in Neder v. United States*, 28 Am. J. Crim. L. 229, 243 (2001):

> Suppose that there is a rape-murder prosecution in which the evidence admitted at trial includes: the defendant's DNA, found at the scene of the crime; his fingerprints, found everywhere at the scene; the fact that he was the victim's estranged husband and jealous of her relationship with another man; the fact that he had threatened her; and his confession to the crime. Now assume that, on appeal, the confession is found to be unconstitutionally coerced. If the question is whether there is enough evidence without the confession to conclude that the jury would have found the defendant guilty beyond a reasonable doubt, the answer is probably yes. If, however, the question is whether the erroneously admitted confession contributed to the verdict in a significant way, it is much more difficult to conclude that the error was harmless. The confession was probably a highly important piece of evidence to the jury, as the defendant's own words. In that

11

"same result" test rather than a literal application of the *Chapman* standard in its most recent decisions, and our own Supreme Court's statement in *Perry* that the two analytical approaches are so similar "that there is no practical difference," we conclude that the *Chapman* harmless error standard does not require reversal if the reviewing court can conclude beyond a reasonable doubt that the jury's finding of guilt "would surely not have been different absent the . . . error." *Sullivan*, 508 U.S. at 280.

Applying this test leads us to differing results in the two cases that are before us. With respect to the case charging offenses against A.R.G., we cannot say that the jury would have arrived at the same verdict had it not heard the erroneously admitted testimony of six witnesses delineating a variety of acts of sexual molestation of children spanning a period of approximately thirty years. Absent that evidence, in A.R.G.'s case the State's evidence would have consisted of only the testimony of A.R.G., A.J., a nurse practitioner, and a counselor. A.J.'s testimony[6] described abuse that was so dissimilar to A.R.G.'s that it had little or no probative value to strengthen the State's proof that Pepcorn committed rape and lewd conduct with A.R.G. The nurse practitioner testified about a sexual assault examination conducted twelve to thirteen years after the charged offenses, when A.R.G. was nineteen years old. Although the nurse practitioner said that A.R.G. had abnormal tearing in her anus that is consistent with her claim that she was anally penetrated by Pepcorn, the nurse practitioner could not opine as to the cause of the tear, saying only that it was abnormal. The probative value of this evidence was limited by the great lapse of time between the alleged criminal act and the forensic examination. A counselor who saw A.R.G. when she was fifteen and again about two years later opined that A.R.G. fit the diagnostic criteria for post-traumatic stress disorder and major depressive disorder. The counselor did not testify to an opinion that A.R.G. had been sexually molested. Pepcorn testified and denied all of A.R.G.'s allegations. Although the State's evidence was unquestionably

---

case, the confession most certainly "contributed" to the verdict, even though there is a significant amount of properly admitted evidence.

[6] We do not imply that A.J.'s testimony would be admissible at a new trial in A.R.G.'s case. We consider it here only because the two cases were consolidated for trial and, on appeal, Pepcorn does not claim error in that consolidation. Therefore, we have not been asked to determine whether A.J.'s testimony was properly heard in A.R.G.'s case.

12

sufficient to support a guilty verdict, we cannot say beyond a reasonable doubt that the jury in this case would have so found in the absence of the very voluminous, irrelevant, and highly prejudicial evidence of molestations of other children by Pepcorn. As in the *Johnson* case, "[evidence] of prior sexual misconduct with young children is so prejudicial that there is a reasonable possibility this error contributed to [the] conviction" and "[t]he danger is too great in this sexual-abuse case that the jury may have believed the prior misconduct demonstrated [the accused's] deviant character traits." *Johnson*, 148 Idaho at 670, 227 P.3d at 924. Therefore, it is necessary to vacate Pepcorn's judgment of conviction in A.R.G.'s case, Docket No. 37314, and remand for a new trial.

We reach a different conclusion, however, in the case charging violations against A.J., Docket No. 37315, A.J.'s testimony was corroborated by the properly admitted testimony of R.H., who said that Pepcorn had engaged in precisely the same improper acts of holding her in the crotch area while lifting her onto horses and brushing her breasts and bottom while hugging her, by A.G. who testified to the same type of touching of her breasts while Pepcorn hugged her, and by A.T., who witnessed Pepcorn's molestation of both A.J. and R.H. as Pepcorn lifted them onto a horse. Given all of this corroborative testimony in A.J.'s case, we are confident beyond a reasonable doubt that the jury would have found Pepcorn guilty of sexual abuse and lewd conduct with A.J. even if none of the incorrectly admitted evidence had been heard.

## III.

## CONCLUSION

The judgment of conviction in Docket No. 37315 is affirmed. The judgment of conviction in Docket No. 37314 is vacated and the case is remanded for further proceedings consistent with this opinion.

Chief Judge GRATTON and Judge GUTIERREZ **CONCUR.**